908 A.2d 868

**OFFICE OF DISCIPLINARY COUNSEL, Petitioner,**

v.

**William Jeffrey YATES, Respondent.**

**No. 1151 Disciplinary Docket No. 3.**

Supreme Court of Pennsylvania.

April 5, 2006.

PER CURIAM.

### *ORDER*

AND NOW, this 25th day of July, 2006, upon consideration of the Report and Recommendations of the Disciplinary Board dated April 5, 2006, it is hereby

ORDERED that William Jeffrey Yates be and he is suspended from the Bar of this Commonwealth for a period of three months, followed by a period of probation for one year. During the period of probation, Respondent shall do the following:

1. Take the Bridge the Gap course through an accredited provider;

2. Take eight additional hours of continuing legal education credits in the area of ethics; and

3. At least ten days prior to the expiration of the period of probation, provide to the Board his Certificates of Attendance for the Bridge the Gap and ethics courses taken.

It is further ORDERED that Respondent shall pay costs to the Disciplinary Board pursuant to Rule 208(g), Pa.R.D.E.

## REPORT AND RECOMMENDATIONS OF THE DISCIPLINARY BOARD OF THE SUPREME COURT OF PENNSYLVANIA

TO THE HONORABLE CHIEF JUSTICE AND JUSTICES OF THE SUPREME COURT OF PENNSYLVANIA:

Pursuant to Rule 208(d)(2)(iii) of the Pennsylvania Rules of Disciplinary Enforcement, the Disciplinary Board of the Supreme Court of Pennsylvania ("Board") herewith submits its findings and recommendations to your Honorable Court with respect to the above-captioned Petition for Discipline.

## I. *HISTORY OF PROCEEDINGS*

On March 24, 2005, Office of Disciplinary Counsel filed a Petition for Discipline against William Jeffrey Yates, Respondent. Charge I of the Petition alleges that Respondent mishandled substantial escrow funds. Charge II alleges that Respondent engaged in neglect, failure to communicate, and a failure to promptly account for and return money in Respondent's possession to which his client was entitled. Respondent filed an Answer to Petition for Discipline on May 11, 2005.

A disciplinary hearing was held on July 21, 2005, before a District III Hearing Committee comprised of Chair David W. Reager, Esquire, and Members James D. Campbell, Esquire, and Philip J. Murren, Esquire. Respondent appeared pro se.

Following the submission of briefs by the parties, the Hearing Committee filed a Report on November 15, 2005, finding that Respondent engaged in professional misconduct and recommending that he be suspended for one year with the suspension stayed in its entirety and one year of probation.

No Briefs on Exception were filed by the parties.

This matter was adjudicated by the Disciplinary Board at the meeting on February 1, 2006.

## II. *FINDINGS OF FACT*

The Board makes the following findings of fact:

1. Petitioner, whose principal office is located at Suite 1400, 200 North Third Street, Harrisburg, Pennsylvania 17101, is invested, pursuant to Rule 207 of the Pennsylvania Rules of Disciplinary Enforcement, with the power and duty to investigate all matters involving alleged misconduct of an attorney admitted to practice law in the Commonwealth of Pennsylvania and to prosecute all disciplinary proceedings brought in accordance with the various provisions of the aforesaid Rules.

2. Respondent, William Jeffrey Yates, was born in 1956 and was admitted to practice law in the Commonwealth in 1984. He maintains his office at 425 Market Street, Williamsport PA 17701. He is subject to the disciplinary jurisdiction of the Disciplinary Board of the Supreme Court.

3. Respondent has no prior record of discipline.

### The Litz Matter

4. In October 1999, the home of Melvin and Peggie Litz, located at 217 Glover Street, Jersey Shore PA, was extensively damaged by fire. The Litzs filed a claim with their homeowner's insurance company, Nationwide Insurance.

5. On February 9, 2000, Respondent filed a Complaint in Divorce on behalf of Peggie Litz, against her husband Melvin.

6. On April 3, 2000, Nationwide Insurance issued a check for $71,362 in connection with the loss related to the Litzs' house. These proceeds were paid over to various creditors/mortgagees.

7. On May 3, 2000, Nationwide issued a check in the amount of $50,518.17 in connection with the Litzs' personal property losses.

8. On May 25, 2000, the Litzs signed an Escrow Agreement concerning the proceeds from the second check, in that the disposition of these funds was an issue in the parties'

divorce. This Agreement was prepared by Frank Fina, Esquire, who was representing Mr. Litz.

9. Respondent was named in this Agreement as "escrow agent". The Agreement provided that Respondent would hold the escrow funds and that he could make disbursement only in connection with the following specific debts or obligations, all of which related to the parties' fire-damaged house at 217 Glover Street, Jersey Shore, Pennsylvania:

a) the outstanding balance, interest and penalties on the PHFA mortgage in the name of Husband and Wife;

b) any outstanding principal, interest, and penalties on the Advanta Mortgage held by Banker's Trust Company of California in the name of Husband and Wife;

c) any outstanding water/sewer obligations;

d) any outstanding property taxes.

10. The Escrow Agreement provided, at paragraph 4: "Except as specifically directed by the terms of the Agreement, no payments shall be made from said escrow funds without the express written consent of Husband and Wife."

11. On June 6, 2000, Respondent opened an account at Sun Bank into which he deposited all proceeds from the May 2000 Nationwide Insurance check.

12. In June 2001, Ms. Litz hired new counsel, Ronald C. Travis, Esquire.

13. By letter dated June 28, 2001, Respondent advised Mr. Travis of the status of the funds he had been holding pursuant to the May 2000 Escrow Agreement. Respondent did not copy Frank Fina or Mr. Litz with this letter.

14. On July 3, 2001, Attorney Travis formally entered his appearance on behalf of Ms. Litz and Respondent withdrew as counsel.

15. On December 3, 2001 and June 10, 2002, Master's hearings were held in connection with the divorce case. Prior to the commencement of the Master's hearings, the Lycoming County Court of Common Pleas issued an Order, dated September 24, 2001, directing that Respondent disclose docu-

ments and information primarily relating to his handling of the escrow funds. By letter dated November 23, 2001, Respondent provided this information to Attorneys Travis and Fina.

16. On March 19, 2002, Raymond J. Lobos, Esquire, entered his appearance on behalf of Mr. Litz.

17. The Master's Report was filed in February 2003.

18. Attorney Lobos wrote to Respondent by letter dated May 13, 2003. Attorney Lobos stated his belief, based upon the case record and Master's Report, that Respondent should be holding escrow funds in the amount of $41,119.22 ($50,-518.17 less $9,398.95 in proper disbursement), and his belief that Respondent had made substantial improper disbursement. He demanded payment of his client's 50% share of the escrowed funds, based upon the Master's findings.

19. Respondent did not respond to this letter.

20. With the knowledge and consent of Mr. Litz and his counsel, Respondent properly made $9,398.95 in disbursements from the aforesaid insurance proceeds of $50,518.17, leaving a balance in the escrow account maintained by Respondent of $41,119.22

21. Without the knowledge or consent of Mr. Litz or his counsel, Respondent made 13 improper distributions totaling $43,104.23, between July 25, 2000 and March 18, 2002.

22. Ten of these disbursements were to Peggie Litz directly, or to a third party for her benefit, such as a car dealership for an automobile, Academy Collection Service, and Beneficial Financial.

23. A payment of $6,000 was made to Ronald C. Travis, Esquire.

24. Disbursements in the amount of $4,000.00 and $321.96 were made to Respondent.

25. In part, Respondent made up his overdraft of Litz funds in the amount of $1,985.02 by utilizing the net interest proceeds of $1,093.57. In addition, on December 13, 2000,

Respondent deposited $12,213.65 in unrelated funds into his bank account.

26. By July 2001, he properly disbursed all of these funds, including fees to himself in the amount of $2,700, except for $891.45.

27. Respondent utilized the $891.45, together with the aforesaid net interest, to make up the $1,985.02 shortfall of Litz funds.

28. Mr. Litz filed a claim with the Lawyers Fund for Client Security, in June 2005, in an amount of $20,297.11. This was the amount that should have been paid to Mr. Litz from the funds held by Respondent, as determined in the Master's Report.

29. With respect to the $6,000 payment by Respondent to Ms. Litz's successor counsel, Ronald Travis, these funds were deposited in Attorney Travis' trust account and disbursed as follows:

a. $4,641.49 to unknown lender to prevent an automobile repossession, pursuant to the agreement of the parties.

b. $1,358.51 to Raymond Lobos, Esquire, counsel for Mr. Litz. Attorney Lobos paid $267.51 to Mr. Litz and retained the balance of $1,091 as fees.

30. Respondent has paid no restitution to Mr. Litz, either directly or through his counsel, Raymond J. Lobos.

### Loner Matter

31. On April 11, 2002, Ms. Patricia Loner filed a District Justice complaint against her landlord, Ryan Monoski, seeking the return of her security deposit in the amount of $550.

32. Following a hearing on May 14, 2002, the District Justice entered a Notice of Judgment for Ms. Loner and against Defendant Monoski in the amount of $602.

33. On June 11, 2002, Mr. Monoski filed a Notice of Appeal from the judgment and a Praecipe to Issue a Rule on Ms. Loner to file a complaint. On the same day, the court entered a Rule on Ms. Loner to file a complaint.

34. On June 25, 2002, Ms. Loner met with Respondent at his office. He agreed to represent her. Respondent indicated it could take six to eight months to schedule an arbitration hearing. He suggested that she wait to hear from him.

35. On this date both Ms. Loner and Respondent executed a fee agreement. She agreed to pay a flat fee of $500 for Respondent's services, including representation at an arbitration hearing.

36. As agreed, Ms. Loner subsequently paid Respondent's fee in two installments of $250 each.

37. Respondent deposited these payments into his general office account at Sovereign Bank, rather than his trust account.

38. In January 2003, Ms. Loner stopped at Respondent's office to check on the status of her case. Respondent was out of the office and the paralegal pulled her file and advised there was nothing new with her case.

39. Ms. Loner spoke to Respondent by telephone on May 21, 2003. Ms. Loner needed to refresh Respondent's memory of the case.

40. When Ms. Loner did not hear anything further from Respondent, she went to the Prothonotary's office in June 2003 and discovered that Respondent had never filed a complaint.

41. Ms. Loner made a series of telephone calls to Respondent during the month of June 2003, which Respondent failed to return.

42. By certified letter to Respondent dated June 16, 2003, Ms. Loner notified Respondent of the circumstances and made a settlement demand for $1,472.10, based on Respondent's alleged negligence.

43. Respondent failed to reply to this letter and did not pay or refund any money to Ms. Loner until he received communications from Office of Disciplinary Counsel about the matter in August through October 2003.

44. In November 2003 Respondent paid Ms. Loner $500 via check drawn on his general office account.

45. The only work performed in Ms. Loner's case was the drafting of an Answer and Counterclaim, which was never filed.

### Relevant Background

46. Respondent was admitted to practice law in 1984. He opened a solo practice in Williamsport in January 1998, following employment over the years as an assistant district attorney and with the Attorney General's Office.

47. Respondent's present practice consists of a general practice including criminal law, family law, bankruptcies and some corporate work. He also served as a public defender during the time frame 2001—2004.

48. Respondent is an adjunct professor at Penn College in the paralegal program.

49. Respondent has approximately 200 open files.

50. During the time frame 1999 through 2001, Respondent's support staff consisted of a secretary. His present staff consists of two paralegals and a secretary.

51. Respondent's office currently utilizes a software based financial record keeping system. He uses this system to segregate client money.

52. Following the commencement of Respondent's representation of Peggie Litz, and his receipt of the insurance proceeds checks which were properly deposited, Ms. Litz repeatedly requested disbursements based upon her post-nuptial agreement.

53. The post-nuptial agreement provided that the marital home was Ms. Litz's exclusively.

53. She requested disbursement for various reasons, including a lack of funds for housing, bail in connection with one of her children, funeral expenses for a grandchild, an automobile, and various other general living expense requests.

54. Respondent has acknowledged that such disbursements were improper, that he has learned a lot from this case, and he would never take such actions again.

55. Respondent fully cooperated with Petitioner's investigation of this matter.

## III. *CONCLUSIONS OF LAW*

By his conduct as set forth above in the Litz Matter, Respondent violated the following Rules of Professional Conduct:

1. RPC 1.15(a)—A lawyer shall hold property of clients or third persons that is in a lawyer's possession in connection with a representation separate from the lawyer's own property.

2. RPC 1.15(b)—Upon receiving funds or other property in which a client or third person has an interest, a lawyer shall promptly notify the client or third person. A lawyer shall promptly deliver to the client or third person any funds or other property that the client or third person is entitled to receive, and, upon request by the client or third person, shall promptly render a full accounting regarding such property.

3. RPC 1.15(c)—When in the course of representation a lawyer is in possession of property in which both the lawyer and another person claim interest, the property shall be kept separate by the lawyer until there is an accounting and severance of their interest. If a dispute arises concerning their respective interests the portion in dispute shall be kept separate by the lawyer until the dispute is resolved.

4. RPC 8.4(c)—It is professional misconduct for a lawyer to engage in conduct involving dishonesty, fraud, deceit or misrepresentation.

By his conduct as set forth above in the Loner Matter, Respondent violated the following Rules of Professional Conduct:

1. RPC 1.3—A lawyer shall act with reasonable diligence and promptness in representing a client.

2. RPC 1.4(a)—A lawyer shall keep a client informed about the status of a matter and promptly comply with reasonable requests for information.

3. RPC 1.4(b) A lawyer shall explain a matter to the extent necessary to permit the client to make informed decisions regarding the representation.

4. RPC 1.15(a)—A lawyer shall hold property of clients or third persons that is in a lawyer's possession in connection with a representation separate from the lawyer's own property.

5. RPC 1.15(b)—Upon receiving funds or other property in which a client or third person has an interest, a lawyer shall promptly notify the client or third person. A lawyer shall promptly deliver to the client or third person any funds or other property that the client or third person is entitled to receive and, upon request by the client or third person, shall promptly render a full accounting regarding such property.

6. RPC 1.16(d)—Upon termination of representation, a lawyer shall take steps to the extent reasonably practicable to protect a client's interests, such as giving reasonable notice to the client, allowing time for employment of other counsel, surrendering papers and property to which the client is entitled and refunding any advance payment of fee that has not been earned.

## IV. *DISCUSSION*

This matter is before the Disciplinary Board for consideration of charges against Respondent alleging that, in the first matter, he improperly handled entrusted funds, and in the second matter, that he neglected his client's case, failed to communicate with her, and failed to refund unearned fees.

Respondent entered into comprehensive admissions of fact and law, thus rendering this matter a degree of discipline case. In order for the Board to properly assign discipline, we must review the facts of these two matters.

In the Litz matter, Respondent received $50,518.17 of insurance proceeds generated by the destruction of his client's marital home. Respondent had fiduciary duties pursuant to the Rules of Professional Conduct to properly handle this money. Respondent's client, Ms. Litz, was going through divorce proceedings and the insurance proceeds were a subject of the proceedings. By order of January 6, 2004, the Divorce Master's recommendation as to the disposition of these particular funds was approved by the Lycoming County Court of Common Pleas. The order awarded to each party 50% of the insurance proceeds. Mr. Litz was entitled to $20,297.11 of the funds.

By this time these funds were long gone, having been disbursed by Respondent over a period of approximately one year. Respondent properly spent $9,398.05, leaving him in possession of funds in the approximate amount of $41,000. Respondent made disbursements of $43,104.23, or more than was contained in Litz funds. These disbursements were primarily to Ms. Litz or for her benefit, as Ms. Litz came to Respondent on various occasions complaining of a lack of funds to meet expenses. Respondent made up the shortfall with the funds of an unrelated client (Seacrist), plus interest that had been generated by the combined money of Litz and Seacrist. Respondent has not made any restitution, as he maintains that it is Ms. Litz who benefited most from the disbursement, and is thus responsible for making Mr. Litz whole. Nevertheless, Respondent stated he would consider personally negotiating a settlement with Mr. Litz.

In the Loner Matter, Respondent began his representation of Patricia Loner in June 2002 in a landlord/ tenant dispute. Respondent agreed to file a complaint in the matter and called for a flat fee of $500, which Ms. Loner paid. A year long period of non-communication and inactivity followed the commencement of representation. Ms. Loner became increasingly frustrated in her attempts to communicate with Respondent, and finally went to the Prothonotary's office, where she discovered Respondent had never filed a complaint on her behalf. Ms. Loner made a demand for the payment of her fees, as well

as for the amount she had lost by virtue of his failure to file the complaint. Respondent eventually refunded Ms. Loner's $500 in November 2003, after the involvement of Office of Disciplinary Counsel.

Some mitigation exists in this case. With respect to his actions in the Litz matter, the record is clear that Respondent was not primarily motivated by greed. Virtually all of the improper disbursements were made to his client, because of her serious financial troubles. The client's demand for the disbursements had some legal basis, albeit a weak one, in that she had signed a post-nuptial agreement with her husband, providing that the marital home was hers exclusively, and that by implication, the insurance proceeds generated by the home's destruction were also hers. It was during this time frame that Respondent acceded to his client's insistent demands that he disburse funds to her. Ultimately, friction between Respondent and Ms. Litz led her to retain new counsel. It was not until February 2003, when the Master's Report was issued, that it became clear Ms. Litz's reliance on her post-nuptial agreement was incorrect. Mr. Litz filed a claim with the Lawyers Fund for Client Security in June 2005.

Additional mitigation exists in that Respondent has practiced law since 1984 and has no prior record of discipline. He cooperated with Petitioner in its investigation of these matters.

Of the two cases involved herein, the Litz matter is the more serious. In matters involving mishandling of escrow funds in connection with which third parties had a claim, a wide range of discipline has been imposed, based in substantial part on the presence/absence of mitigating or aggravating factors. For instance, in the matter of *In re Anonymous No. 7 D.B. 86 & 22 D.B. 87*, 49 D. & C.3d 165 (1988), the respondent, who had a lengthy prior disciplinary history, improperly disbursed $1,500 to a client despite the interests of a third party. This misconduct was compounded by multiple misrepresentations made in a separate matter. This respondent was suspended for two years. In the matter of *In re Anonymous*, 5 Pa. D. & C.4th 259 (1989), an inexperienced

practitioner who was the escrow holder spent $2,000 of escrow funds, but repaid it two months later. This respondent received a private reprimand from the Disciplinary Board. These cases, as well as other similar cases, may be distinguished on the facts in that Respondent's mishandling of the Litz funds was for the benefit of a financially burdened client, as opposed to benefiting himself.

The Board is persuaded, upon careful review of the record, that as Respondent's motivation for the mishandling of the escrowed funds was not based on greed, it is highly unlikely that such conduct will reoccur. Respondent acknowledged his wrongdoing and stated that he has learned from the circumstances, which suggests that he understands not to engage in such conduct in the future. Balancing the facts of the matter with the mitigating circumstances, the Board recommends that Respondent be suspended for three months, followed by a one year period of probation with conditions. As noted above, a claim was filed with the Lawyers Fund for Client Security by Melvin Litz. In the event an award is made to Mr. Litz, Respondent is required to repay the Fund in full. This restitution must be made prior to reinstatement to the bar. Pa.R.D.E. 531.

## V. *RECOMMENDATION*

The Disciplinary Board of the Supreme Court of Pennsylvania recommends that the Respondent, William Jeffrey Yates, be suspended from the practice of law for a period of three months, followed by a period of probation for one year. During the period of probation, Respondent shall do the following:

1. Take the Bridge the Gap Course through an Accredited PA CLE Bridge the Gap Provider;

2. Take eight additional hours of PA Continuing Legal Education credits in the area of Ethics; and

3. At least ten (10) days prior to the expiration of the period of Probation, provide to the Board his Certificates of Attendance for the Bridge the Gap Course and Ethics courses taken.

It is further recommended that the expenses incurred in the investigation and prosecution of this matter are to be paid by the Respondent.

Respectfully submitted,

THE DISCIPLINARY BOARD OF THE SUPREME COURT OF PENNSYLVANIA

By: _____
Francis X. O'Connor, Board Member

Date: April 5, 2006

Board Members Rudnitsky, Gephart, Wright and Suh dissented and would recommend a one year suspension stayed in its entirety and that Respondent be placed on probation for a period of one year as recommended by the Hearing Committee.